913 F.2d 993
 31 Fed. R. Evid. Serv. 311
 UNITED STATES of America, Appellee,
v.
Gregory SCARPA, Jr., Kevin Granato, Cosmo Catanzano, Mario
Parlagreco, William Meli, Joseph Savarese, Nunzio
Decarlo, Letterio Decarlo, Ralph Russo,
John Parlagreco, Defendants.
Appeal of Cosmo CATANZANO, William Meli, Joseph Savarese,
Nunzio Decarlo, Kevin Granato, John Parlagreco,
Mario Parlagreco, Defendants-Appellants.
 Nos. 448 to 454, Dockets 88-1392, 88-1423, 88-1424, 88-1425,
88-1453, 88-1454 and 88-1485.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 30, 1989.
Decided Aug. 23, 1990.
 
 David W. Ely, New York City, for defendants-appellants William Meli, Joseph Savarese and John Parlagreco.
 Christine E. Yaris, New York City, for defendants-appellants Mario Parlagreco and Kevin Granato.
 Richard A. Rehbock, New York City, for defendant-appellant Cosmo Catanzano.
 Susan G. Kellman, New York City, for defendant-appellant Nunzio DeCarlo.
 Jerome C. Roth, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Matthew E. Fishbein, David C. James, Asst. U.S. Attys., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellee.
 Before OAKES, Chief Judge, and MINER and MAHONEY, Circuit Judges.
 MAHONEY, Circuit Judge:
 Kevin Granato ("Granato"), Cosmo Catanzano ("Catanzano"), Mario Parlagreco ("M. Parlagreco"), William Meli ("Meli"), Joseph Savarese ("Savarese"), Nunzio DeCarlo ("DeCarlo") and John Parlagreco ("J. Parlagreco") appeal from judgments of conviction for violations of 18 U.S.C. Sec. 1962(c) (1988), a provision of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and various other federal laws entered after a jury trial in the United States District Court for the Eastern District of New York, I. Leo Glasser, Judge.
 
 
 1
 An eleven-count superseding indictment, No. 87 Cr. 760(S-2)(ILG), was filed in the Eastern District of New York on January 27, 1988,[1] naming the appellants and others[2] as defendants. Count one charged that in violation of 18 U.S.C. Sec. 1962(c) (1988), Granato, Catanzano, M. Parlagreco, Meli and DeCarlo conducted, and participated in the conduct of, the affairs of a criminal enterprise led by Scarpa (the "Scarpa Crew" or "Crew"), which "reported to the Colombo Organized Crime Family." The "goal" of the Crew was allegedly "to raise money through the trafficking of narcotics and other controlled substances, and extortion." The Indictment charged that the Scarpa Crew "exerted control over certain areas in the Bensonhurst section of Brooklyn, New York," and "ran several marijuana concessions on Staten Island" from July, 1985 until January 27, 1988.
 
 
 2
 Count one of the Indictment alleged that, through various combinations of its membership, the Scarpa Crew engaged in the following eight acts of racketeering as predicates to a violation of section 1962(c): (1) conspiracy among Granato, Catanzano, M. Parlagreco, Meli and DeCarlo to distribute marijuana in or about and between July, 1985 and February, 1986 in violation of 21 U.S.C. Sec. 846 (1988); (2) conspiracy between Granato and M. Parlagreco to distribute cocaine hydrochloride in or about and between September, 1985 and February, 1986 in violation of 21 U.S.C. Sec. 846 (1988); (3) conspiracy between Granato and Catanzano to distribute heroin hydrochloride and cocaine hydrochloride on or about and between January 6, 1987 and March 20, 1987 in violation of 21 U.S.C. Sec. 846 (1988); (4) murder in the second degree of one Albert Nocha committed by Granato, Catanzano, M. Parlagreco and DeCarlo on or about and between December 8, 1985 and December 10, 1985 in violation of N.Y.Penal Law Secs. 125.25 and 20.00 (McKinney 1987);[3] (5) conspiracy among Granato, M. Parlagreco and Meli to affect commerce by extortion in or about and between September, 1985 and April, 1986 in violation of 18 U.S.C. Sec. 1951 (1988); (6) conspiracy among Granato, Catanzano, M. Parlagreco, Meli and DeCarlo to affect commerce by extortion on or about and between February 20, 1986 and April 23, 1986 in violation of 18 U.S.C. Sec. 1951 (1988), specifying as overt acts the beating of one Eric Leon ("Leon") for failure to pay a debt owed to Scarpa, and related events; (7) intimidation by DeCarlo of a witness, Leon, on or about February 24, 1986 in violation of 18 U.S.C. Sec. 1512(a)(3) (1982); and (8) bribery in the third degree of New York City police officers by DeCarlo on ten occasions from on or about November 9, 1985 to February 15, 1986 in violation of N.Y.Penal Law Sec. 200.00 (McKinney 1988).
 
 
 3
 Count two charged Granato and M. Parlegreco with engaging in a continuing criminal enterprise in or about and between July, 1985 and January 27, 1988 in violation of 21 U.S.C. Sec. 848(a) (1988). Count three charged Granato, Catanzano, M. Parlagreco, Meli and DeCarlo with conspiracy to distribute marijuana in or about and between July, 1985 and February, 1986 in violation of 21 U.S.C. Secs. 846 and 841(b)(1)(D) (1988). Count four charged Granato, Catanzano, M. Parlagreco, Meli and DeCarlo with distributing marijuana in or about and between July, 1985 and February, 1986 in violation of 21 U.S.C. Secs. 841(a)(1) and 841(b)(1)(D) (1988) and 18 U.S.C. Sec. 2 (1988). Count five charged Granato, M. Parlagreco and Meli with conspiracy to commit extortion in or about and between September, 1985 and April, 1986 in violation of 18 U.S.C. Sec. 1951 (1988). Count six charged Granato with carrying a firearm in relation to a crime of violence in September, 1985 in violation of 18 U.S.C. Sec. 924(c) (1988).
 
 
 4
 Count seven charged Granato, Catanzano, M. Parlagreco, Meli, Savarese, DeCarlo and J. Parlagreco with conspiracy to extort Leon in or about and between February 20, 1986 and April 23, 1986 in violation of 18 U.S.C. Sec. 1951 (1988). Count eight charged Granato, Catanzano, M. Parlagreco, Meli, DeCarlo, Savarese and J. Parlagreco with committing extortion by physical violence and threats of physical violence upon Leon on or about February 20, 1986 in violation of 18 U.S.C. Secs. 1951 and 2 (1988). Count nine charged Granato, Meli and DeCarlo with assault resulting in serious bodily injury upon Leon for the purpose of maintaining or increasing their position in a criminal enterprise engaged in racketeering activity on or about February 20, 1986 in violation of 18 U.S.C. Secs. 1959 and 2 (1988). Count ten charged Granato and M. Parlagreco with intimidating a witness, Leon, on or about February 20, 1986 in violation of 18 U.S.C. Secs. 1512(b)(3) and 2 (1988). Count eleven charged DeCarlo with intimidating a witness, Leon, on or about February 24, 1986 in violation of 18 U.S.C. Sec. 1512(b)(3) (1988).
 
 
 5
 Before he could be brought to trial, Scarpa fled the jurisdiction, became a fugitive, and was thereafter apprehended and arrested by agents of the Drug Enforcement Administration ("DEA") in a motel in Lakewood, New Jersey on August 29, 1988. He was tried separately before a jury in the United States District Court for the Eastern District of New York, I. Leo Glasser, Judge, and convicted of conducting a racketeering enterprise in violation of 18 U.S.C. Sec. 1962(c) (1988); engaging in a continuing criminal enterprise in violation of 21 U.S.C. Sec. 848(a) (1988); conspiring to distribute marijuana in violation of 21 U.S.C. Sec. 846 (1988); distributing marijuana in violation of 21 U.S.C. Sec. 841(a)(1) (1988); and two counts of conspiring to commit extortion, and one count of extortion, in violation of 18 U.S.C. Sec. 1951 (1988). See United States v. Scarpa, 897 F.2d 63, 64 (2d Cir.1990), petition for cert. filed, No. 89-1856 (U.S. May 24, 1990). His appeal was heard in tandem with the instant appeal, and his conviction was affirmed by this court on February 23, 1990. Id.
 
 
 6
 The trial of the appellants herein, which took place while Scarpa was a fugitive, began on May 23, 1988 and ended on July 15, 1988, when the jury returned a verdict. Granato, Catanzano, M. Parlagreco, Meli and DeCarlo were all convicted on count one, the RICO count. The jury determined that all predicate acts were proved, as charged, against all defendants, except that predicate act four, the murder of Albert Nocha, was proven only against DeCarlo, and not against Granato, Catanzano and M. Parlagreco. All defendants were found guilty of all other counts as charged in the Indictment, except that Granato was acquitted on count six, carrying a firearm in relation to a crime of violence.
 
 
 7
 All appellants except J. Parlagreco were sentenced to concurrent prison terms on each count of conviction, with the maximum term for each appellant as follows: Granato, fifteen years plus a special parole term of ten years and a $10,000 fine; Catanzano, seven years plus a special parole term of five years; M. Parlagreco, twenty years plus a special parole term of five years; Meli, fifteen years plus a special parole term of ten years; Savarese, five years plus five years probation; and DeCarlo, twenty years plus a special parole term of ten years. J. Parlagreco's sentence was suspended, and he was placed on probation for five years. The district court also imposed, as required by 18 U.S.C. Sec. 3013 (1988), a special assessment of fifty dollars upon each defendant for each count of conviction.
 
 
 8
 We affirm.
 
 Background
 
 9
 In view of the jury verdicts, we consider the evidence in the light most favorable to the government. The evidence presented at trial included surveillance photographs, soundless videotapes, tape recordings and the testimony of numerous witnesses. The Scarpa Crew, under the leadership of Scarpa, an alleged "capo" in the Colombo organized crime family, operated several lucrative marijuana sales locations (known as "spots") in parts of Brooklyn and Staten Island from approximately July, 1985 until the termination of that activity as a result of this criminal proceeding.
 
 
 10
 Other illegal activity that stemmed from the operation of the spots included bribing New York City police officers in an effort to protect the spots from police interference, extorting money from competing drug dealers who also distributed marijuana in the area, murdering a competing dealer, and brutally assaulting an associate in an effort to extort money which he owed to the Crew. It was also established that members of the Scarpa Crew, on occasion, engaged in the distribution of heroin and cocaine.
 
 
 11
 A. Distribution of Marijuana.
 
 
 12
 According to testimony at trial, the Scarpa Crew first became involved in marijuana distribution in the summer of 1985 when they ousted two dealers, Scotty Brennan and Peter Crupi,[4] from a location adjacent to Staten Island College (the "college spot"). The operation at the college spot proved highly lucrative, so the Scarpa Crew also established spots at Wolf's Pond Park on Staten Island, and at 13th Avenue and 73rd Street, and 20th Avenue and 81st Street, both in Brooklyn.
 
 
 13
 The college spot, however, remained the primary location. It was operated for the Scarpa Crew by Leon, who had been employed by the Crew for $100 per night. Other lower-level workers, earning approximately $30-$70 per night, were employed by the Crew to function as "chickeys" or look-outs, "dealers," who distributed marijuana to buyers, and "runners," who collected the money from the dealers and brought it back to Leon.
 
 
 14
 In a typical day of operation, Letterio DeCarlo would prepare the marijuana for sale by bagging it in individual packets and then placing the packets in duffle bags. Leon and the workers would gather at Mike's Candy Store on 69th Street in Brooklyn at approximately 4:30--5:00 p.m. and either wait for Letterio DeCarlo, Granato or M. Parlagreco to bring the marijuana in duffle bags to the candy store, or go to Letterio DeCarlo's house to pick it up. The group would then assemble in several cars and drive to the college spot at about 6:00 p.m.
 
 
 15
 Upon arrival, Leon would distribute the marijuana to the dealers, who in turn sold it to customers who walked or drove by. Leon, Granato, M. Parlagreco, Meli or Catanzano, and sometimes DeCarlo would wait close by and observe as the marijuana was sold.
 
 
 16
 At about 9:00 p.m., the spot would close down and Granato, M. Parlagreco, Meli and an individual who had been hired to count the money would depart and do the counting at that individual's apartment. An evening's proceeds usually exceeded $10,000, and the amount sometimes reached as high as $17,000 or $18,000. Finally, after the money had been counted, the workers would be paid by Leon, and the assemblage would return to Brooklyn in cars.
 
 
 17
 B. Bribery.
 
 
 18
 Police interference proved costly to the operation. The Crew originally conducted sales in a college parking lot near a highway, but following regular police raids, they were forced to move the operation to a secluded area at a nearby underpass beneath a highway. On several occasions, workers were arrested, and a lawyer was hired for their arraignment. Initially, the Crew paid the lawyer's fee and any required bail, but this practice was eventually terminated.
 
 
 19
 In order to eliminate police interference, DeCarlo attempted to bribe police officers from the local precinct. The bribery began on November 1, 1985, after police officer Thomas Tobin ("Tobin") arrested DeCarlo at the college spot for driving with a suspended license. After his booking, DeCarlo told Tobin that he did not wish to continue paying lawyers' fees and city fines, but would prefer to pay police officers in exchange for lightened enforcement activity at the college spot. DeCarlo offered to pay as much as $400-$600 to each police officer involved, and told Tobin to return to the college spot the following night if he was interested in such an arrangement.
 
 
 20
 Tobin notified the Internal Affairs Division ("IAD") of the New York City Police Department of the situation, and the IAD assigned Sergeant Gino Modesti ("Modesti") to accompany Tobin to the meeting with DeCarlo the next night. The police officers pretended to place DeCarlo under arrest. After driving a few blocks, they parked their radio car and conducted a meeting with DeCarlo. Granato and Meli were surveilled parked nearby, observing the meeting. The officers discussed with DeCarlo the bribery arrangement he had suggested, and recorded their conversation.
 
 
 21
 Over the course of the following five months, Tobin, Modesti and Vincent Murano ("Murano"), an IAD undercover detective, met or spoke by phone with DeCarlo on approximately thirty occasions. In addition to receiving protection for the marijuana spots, DeCarlo requested assistance in fixing a cocaine charge pending against him, and in arranging for the recovery of drug money that had been seized in an arrest of Leon. In return, DeCarlo paid bribes to the officers totalling in excess of $10,000.
 
 
 22
 C. The Murder of Albert Nocha.
 
 
 23
 In addition to police interference, the Scarpa Crew had to reckon with competing drug dealers. In December, 1985, another marijuana dealer, Albert Nocha ("Nocha"), began selling marijuana at a location in Clove Lake Park, not far from the Scarpa Crew's college spot. Leon warned Nocha not to sell there, but Nocha refused to relocate. Leon reported the encounter to DeCarlo, and DeCarlo reported Nocha's marijuana sales to Scarpa.
 
 
 24
 On a subsequent evening, Leon, DeCarlo and several associates again encountered Nocha. DeCarlo warned Nocha to leave the location in Clove Lake Park, but Nocha again refused to do so.
 
 
 25
 On December 10, 1985, Albert Nocha was found shot to death in Clove Lake Park. He had approximately $400 in small bills in his pocket and a paper bag containing marijuana in his hand. An autopsy revealed that he had been shot once in the chest and three times in the head at point-blank range. Evidence at trial, including Leon's testimony that DeCarlo told Leon that DeCarlo had killed Nocha, tied DeCarlo to the shooting.
 
 
 26
 D. Extortion of Other Drug Dealers.
 
 
 27
 The Scarpa Crew also extorted money from marijuana dealers who worked in adjoining neighborhoods. One of these dealers, Vincent LaFaro ("LaFaro"), operated from a park at 66th Street and Fort Hamilton Parkway in Brooklyn. In the summer of 1985, he was approached there by Granato and M. Parlagreco, who identified themselves as members of the Scarpa Crew and demanded that LaFaro pay them $1,000 per week for protection. They directed LaFaro to appear with the money every Thursday at the Parkway Luncheonette at 75th Street and 13th Avenue in Brooklyn.
 
 
 28
 LaFaro, however, did not make the $1,000 payment the following week, whereupon Granato and M. Parlagreco returned and threatened him with a gun, stating that if he did not pay, they would compel him to discontinue his operation. LaFaro, believing that Granato and M. Parlagreco would injure him if he did not pay in the future, began making payments. Over the course of the next seven months, LaFaro delivered $1,000 every Thursday or Friday at the Parkway Luncheonette, usually to Granato and M. Parlagreco, but on one occasion to Scarpa and another to Meli.
 
 
 29
 E. Cocaine and Heroin Distribution.
 
 
 30
 The Scarpa Crew also engaged in sales of cocaine and heroin. At least some of the bulk purchases were made through a New Jersey "connection" and an individual named "Eddie" on Staten Island who provided the Scarpa Crew with kilograms of cocaine.
 
 
 31
 In the first series of sales, Granato and M. Parlagreco sold cocaine to Leon and to other customers. Leon was typically provided with cocaine at a cost of $900 per ounce, but was not required to make payment until he resold it to his own customers, including individuals known to him as "Sal from Virginia," "Sal from New Jersey" and "Big Nick." When an order for cocaine was provided by one of these customers, Leon would call M. Parlagreco and meet him or Granato at Granato's home on Staten Island to pick up the cocaine.
 
 
 32
 In a second series of transactions occurring at various times from January through March, 1987, Granato and Catanzano sold cocaine and heroin to a dealer named Anthony DeBiase. DeBiase would generally meet Granato or Catanzano at one of several restaurants in Brooklyn to pick up the narcotics, deliver it to a buyer at a different restaurant, and return to pay Granato and Catanzano. On six occasions, Granato and Catanzano sold quantities of up to one quarter of a kilogram of cocaine and an eighth of a kilogram of heroin to DeBiase, which he later unwittingly resold to undercover officers.
 
 
 33
 After the last narcotics sale on March 20, 1987, DeBiase, Granato and Catanzano were arrested as they drove away from the scene of the transaction. Granato and Catanzano were subsequently convicted on October 8, 1987, after a jury trial in the United States District Court for the Eastern District of New York, of a conspiracy to distribute heroin and cocaine between January and March, 1987, as well as of related distributions of cocaine and heroin. A corresponding conspiracy was charged as predicate act three of count one of the Indictment.
 
 
 34
 F. The Extortion of Eric Leon.
 
 
 35
 Leon, the manager of the college spot, eventually fell into disfavor with the Scarpa Crew after he ran up a considerable debt. Leon's trouble began on New Year's Eve, December 31, 1985, when he was left alone to manage the college spot. Leon collected approximately $8,000 that night from marijuana sales, the sale of cocaine to Sal from New Jersey, and the collection of money from Sal from Virginia. After hiding the money in a box in the trunk of the car he was using, he began driving to Brooklyn. His car broke down while enroute, and Leon was taken into custody by police who observed him selling brass knuckles from the trunk of the disabled car. The officers later searched the vehicle and found marijuana in its trunk, but did not find the hidden money. Leon was placed under arrest for marijuana possession and other charges, and was released on bail two days later. In the interim, however, he arranged for a friend to retrieve the cash from the car trunk. Leon and his friend divided the money.
 
 
 36
 Upon his release, Leon reported the event to the Scarpa Crew, but did not tell them that his friend had retrieved the money from his car trunk. Granato and M. Parlagreco, believing Leon at first, advised him not to worry about the missing money, because DeCarlo believed he could use his influence with the police officers whom he was bribing to recover it. When DeCarlo's efforts proved unavailing and it became clear that the money was missing from the car trunk, Leon was told that he would have to repay the missing money.
 
 
 37
 In addition, Leon owed the Scarpa Crew money for cocaine he had purchased and for marijuana proceeds that were missing from the college spot. The total amount owed was approximately $21,000. Leon eventually stopped going to the college spot because he feared that the Scarpa Crew would harm him as a result of the large debt. However, after a meeting with Scarpa, Granato and M. Parlagreco at which Leon stated his intention to pay his debt to the Crew over time, Leon resumed his activities at the college spot.
 
 
 38
 In addition to working at the college spot without pay, Leon tried to raise money by selling marijuana independently and borrowing money from his friends. He also stole $5,000 from Sal from Virginia.[5] In addition, he turned over his television set and video recorder to Granato.
 
 
 39
 Apparently, the Scarpa Crew was dissatisfied with the rate at which Leon was repaying the debt, and was further dissatisfied that Leon had stolen money from Sal from Virginia, who was a good friend of J. Parlagreco. On February 20, 1986 Leon was summoned to meet with Crew members at Mike's Candy Store. When Leon arrived at the store at about 4:30 p.m., all of the appellants were there, as well as Scarpa and Letterio DeCarlo. After greeting Leon, however, Scarpa promptly departed.
 
 
 40
 J. Parlagreco and M. Parlagreco questioned Leon about the $5,000 transaction with Sal from Virginia. Granato then handed Leon a quarter and told him that he had ten minutes to raise $17,000, and that he could not leave the store to get the money. While Leon was talking to a friend on the telephone, Meli hit Leon in the head. Leon then hung up the phone, and was savagely beaten by Meli, DeCarlo and Savarese with fists, brass knuckles and a baseball bat, while Granato and Catanzano stood by in the front doorway. The beating ended when Granato shouted: "That's enough."
 
 
 41
 G. The Intimidation of Leon.
 
 
 42
 After Leon sustained the beating in the candy store, Granato and M. Parlagreco dragged him outside to the sidewalk and told him that he still had to repay the money. Meli came out of the candy store and warned Leon that if he told the police about the beating, the Crew would kill Leon's daughter. Granato also warned Leon not to try to run away to Puerto Rico, because the Crew would kill someone in his family. Leon then escaped over a fence and ran into a nearby house, and a woman in the house called the police.
 
 
 43
 When police officers first arrived, Leon told them that several men whom he did not know had jumped out of a car, struck him with baseball bats, and sped off. He was then taken to the emergency room of Maimonides Hospital, where he was treated. X-rays showed that his arm had been broken in two places and the base of his thumb had been snapped.
 
 
 44
 Shortly after Leon arrived at the hospital, DeCarlo walked into the emergency room. Leon's sister, who had arrived earlier, began screaming, and DeCarlo left. Immediately after DeCarlo departed, Leon asked the police for protection, and told them that he had been beaten by associates of Scarpa, naming (according to New York City Police Detective Robert Rodenburg ("Rodenburg")) Mario and John "Pellegrino," Granato, DeCarlo, "Meli or Miley" and Scarpa.
 
 
 45
 Leon was later transferred to Coney Island Hospital. DeCarlo visited Leon there and warned him that if he did not pay the debt owed to the Scarpa Crew, he and his family would be killed. DeCarlo also warned Leon not to speak to the police, and threatened that if Leon testified against the Crew, they would kill his family and his daughter, and would eventually kill him.
 
 
 46
 H. Leon's Cooperation.
 
 
 47
 New York City Police Detective Richard Puntillo ("Puntillo") visited Leon at Coney Island Hospital. During their first meeting, Leon asked the detective for protection from the Scarpa Crew. Puntillo promised Leon that the government would pay his debt to the Scarpa Crew and provide him with protection if Leon would cooperate in an investigation of the Scarpa Crew by possibly "wear[ing] a wire," providing introductions to Crew members, and "possibly testify[ing] in court somewhere down the road." Leon agreed.
 
 
 48
 On the day Leon was released from the hospital, he met with Puntillo and arranged to record a conversation with Crew members. A wire recorder was concealed in Leon's arm cast, and Puntillo gave Leon $5,000 to pay part of his outstanding debt. Leon was then driven by a detective to a bar where he met with Granato and Catanzano.
 
 
 49
 Leon gave the $5,000 to Granato. During the attendant conversation, Leon described the injuries he had sustained as a result of the beating in the candy store. Granato interjected: "You got off easy." Leon then asked Granato to tell Scarpa that Leon would repay the remainder of the debt, and that he hoped to return to work at the college spot. Granato responded: "we'll work it out."
 
 
 50
 One week later Leon called M. Parlagreco, who agreed to meet Leon at the candy store. On March 8, 1986, Leon was wired and provided with an additional $6,000. J. Parlagreco showed up for the meeting at the candy store, and Leon gave him the $6,000 to pass on to M. Parlagreco and Granato. J. Parlagreco warned Leon not to talk on the telephone about Leon's debt to the Crew.
 
 
 51
 Leon later made three additional payments on his debt to the Scarpa Crew. Each payment was made at the candy store, after a telephone conversation with M. Parlagreco--the first to Savarese on April 1, 1986 in the amount of $2,000; the second to an individual named Charlie Manse, nicknamed "Charlie Springs," on April 17, 1986 in the amount of $1,000; and the third to Mike, the owner of the store, on April 23, 1986 in the amount of $3,000.
 
 
 52
 Further factual matters will be set forth in the discussion of the issues to which they relate.
 
 Discussion
 
 53
 Appellants urge numerous grounds for reversal, and most join in each other's arguments, to the extent generally applicable, pursuant to Fed.R.App.P. 28(i). We consider their claims that: (a) the evidence was insufficient to establish that (1) J. Parlagreco committed extortion and conspired to do so, (2) M. Parlagreco was an organizer, supervisor or manager of the Scarpa Crew's narcotics activity within the meaning of 21 U.S.C. Sec. 848(a) (1988), (3) the requisite link existed between the narcotics conspiracy charged against Catanzano in predicate act three of count one and the enterprise charged in the indictment, and (4) DeCarlo committed the murder of Albert Nocha charged as predicate act four of count one; (b) the district court improperly denied defense motions to obtain copies of government surveillance tapes; (c) the district court improperly refused to strike a reference in the indictment to "the Colombo Organized Crime Family"; (d) the government engaged in an improper "stepladder" prosecution of Catanzano; (e) the trial of Savarese should have been severed; (f) certain of the district court's evidentiary rulings were improper; (g) various jury instructions were improper; and (h) DeCarlo should have been granted a psychiatric examination prior to sentencing.
 
 
 54
 A. Sufficiency of the Evidence.
 
 
 55
 Several appellants claim that the evidence presented against them was insufficient to support their convictions on a variety of counts. Before considering specific claims as to the sufficiency of the evidence, we review the general standards by which these contentions are to be assessed.
 
 
 56
 An appellant challenging the sufficiency of the evidence bears " 'a very heavy burden.' " United States v. Nusraty, 867 F.2d 759, 762 (2d Cir.1989) (quoting United States v. Young, 745 F.2d 733, 762 (2d Cir.1984) (quoting United States v. Carson, 702 F.2d 351, 361 (2d Cir.), cert. denied, Y462 U.S. 1108, 103 S.Ct. 2456 & 2457, 77 L.Ed.2d 1335 (1983))), cert. denied, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); see also United States v. Buck, 804 F.2d 239, 242 (2d Cir.1986); United States v. Grubczak, 793 F.2d 458, 462 (2d Cir.1986). In reviewing such claims, we "view the evidence in the light most favorable to the government and construe all possible inferences in its favor." United States v. Badalamenti, 794 F.2d 821, 828 (2d Cir.1986) (citing United States v. Martino, 759 F.2d 998, 1002 (2d Cir.1985)). "The test is 'whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt.' " United States v. Chang An-Lo, 851 F.2d 547, 554 (2d Cir.) (quoting Grubczak, 793 F.2d at 463 (citations omitted)), cert. denied, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988). The government is not "required to preclude every reasonable hypothesis which is consistent with innocence." Chang An-Lo, 851 F.2d at 554 (citing United States v. Fiore, 821 F.2d 127, 128 (2d Cir.1987)). In sum, a jury's verdict will be sustained if there is substantial evidence, taking the view most favorable to the government, to support it. United States v. Nersesian, 824 F.2d 1294, 1324 (2d Cir.), cert. denied, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987).
 
 
 57
 We now turn to appellants' specific claims of insufficiency.
 
 
 58
 1. John Parlagreco.
 
 
 59
 18 U.S.C. Sec. 1951(a) (1988) prescribes criminal penalties for any person who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by ... extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose" to violate the section. The term "extortion" is defined in pertinent part as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. Sec. 1951(b)(2) (1988).
 
 
 60
 J. Parlegreco was convicted on two separate counts under section 1951(a)--count seven for conspiring to extort money from Leon during the period February 20, 1986 through April 23, 1986, and count eight for wilfully committing and threatening to commit physical violence against Leon on February 20, 1986, the day Leon was assaulted in Mike's Candy Store. On appeal, J. Parlagreco challenges the sufficiency of the evidence on both counts, claiming that "there was simply no evidence that [he] calculatingly used threatening words or gestures to induce Mr. Leon to make the payments," but rather that he was merely present on the occasion of Leon's beating; and that his later receipt of a $6,000 payment from Leon on March 8, 1986 was inadequate proof of his membership in a conspiracy to extort money from Leon.
 
 
 61
 The government, on the other hand, contends that, although J. Parlagreco never physically assaulted Leon, "the jury was entitled to find that [J.] Parlagreco knew of the conspiracy to extort Leon and actively participated in it by appearing at the candy store in order to intimidate Leon, threatening Leon with ... [a] comment about Sal [from Virginia], and accepting the March 8 payment."
 
 
 62
 Since J. Parlagreco calls into question the adequacy of the evidence supporting his conspiracy conviction, it is appropriate at this juncture to review the general principles governing the sufficiency of evidence to sustain a conspiracy conviction.
 
 
 63
 Because "conspiracy by its very nature is a secretive operation," United States v. Provenzano, 615 F.2d 37, 45 (2d Cir.), cert. denied, 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980), "the '[e]xistence of and participation in a conspiracy ... may be established ... through circumstantial evidence.' " United States v. Soto, 716 F.2d 989, 991 (2d Cir.1983) (quoting United States v. Sanzo, 673 F.2d 64, 69 (2d Cir.), cert. denied, 459 U.S. 858, 103 S.Ct. 128, 74 L.Ed.2d 111 (1982)). However, "knowledge of the existence and goals of a conspiracy does not of itself make one a coconspirator." United States v. Cianchetti, 315 F.2d 584, 588 (2d Cir.1963).
 
 
 64
 Similarly, "[a]ssociation with a conspirator, without more, is insufficient to establish the requisite degree of participation in a conspiratorial venture." United States v. Steinberg, 525 F.2d 1126, 1134 (2d Cir.1975), cert. denied, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976); see also United States v. Johnson, 513 F.2d 819, 824 (2d Cir.1975) ("Guilt may not be inferred from mere association with a guilty party."). Moreover, " 'absent evidence of purposeful behavior, mere presence at the scene of a crime, even when coupled with knowledge that a crime is being committed, is insufficient to establish membership in a conspiracy....' " Chang An-Lo, 851 F.2d at 554 (quoting Martino, 759 F.2d at 1002 (citations omitted)).
 
 
 65
 Thus, evidence of purposeful behavior designed to further a conspiracy must be shown to prove membership in that conspiracy. See United States v. Torres, 519 F.2d 723, 726 (2d Cir.), cert. denied, 423 U.S. 1019, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975). However, "once a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming." United States v. Casamento, 887 F.2d 1141, 1156 (2d Cir.1989) (citing United States v. Ciambrone, 787 F.2d 799, 806 (2d Cir.), cert. denied, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986)), cert. denied, --- U.S. ----, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990).
 
 
 66
 We turn now to the evidence presented by the government regarding J. Parlagreco. It was established at trial that J. Parlagreco was present in Mike's Candy Store on the day Leon was beaten. Leon testified as follows regarding his entry into the store on the day of the assault:
 
 
 67
 Q When you walked in what happened?
 
 
 68
 A As I walked in there were two guys in the front door. There was some kid named Casper and some kid named Angelo. As I walked in Angelo looked at me, look who it is, the man of the hour.
 
 
 69
 This statement tends to establish that those present in the store beforehand, including J. Parlagreco, were discussing Leon and planning the assault which ensued.
 
 
 70
 Leon also testified as follows regarding a conversation he had with J. Parlagreco just moments before he was beaten:
 
 
 71
 Q Did you have a conversation with anyone when you got into the candy store?
 
 
 72
 A Yes. John Parlagreco looked at me and said, what happened.
 
 
 73
 Q Was John Parlagreco in the candy store when you first arrived?
 
 
 74
 A Yes, he was.
 
 
 75
 Q What happened in your conversation with John Parlagreco?
 
 
 76
 A He said what happened with you and Sal. So what do you mean what happened with me and Sal.
 
 
 77
 He goes, you beat him for money. I said I didn't beat him for money. You don't know what you are talking about. And then Mario Parlagreco--
 
 
 78
 Q Excuse me, Mr. Leon.
 
 
 79
 When he said, what did you do to Sal what did you understand he was talking about?
 
 
 80
 A What I did to him with the cops, I pretended they were cops.[6]
 
 
 81
 Q Which Sal was this?
 
 
 82
 A This Sal from Virginia.
 
 
 83
 Q Do you know whether John Parlagreco knew Sal from Virginia?
 
 
 84
 A Yes, they were good friends.
 
 
 85
 Q Go ahead with the conversation you had with John Parlagreco.
 
 
 86
 He said what did you do to Sal. What did you say?
 
 
 87
 A I said you don't know what I did to Sal, meaning it doesn't concern him.
 
 
 88
 So Mario turned around and said what did you do, what did you do about my house. Right there and then I knew, more or less, what was going to happen to me. So then Kevin pulled out a quarter. He said I'll give you ten minutes to come up with $17,000.
 
 
 89
 This conversation indicates participation by J. Parlagreco in the planning and implementation of the assault upon Leon.
 
 
 90
 In addition, it was established that on March 8, 1986, J. Parlagreco accepted a $6,000 payment from Leon for application to Leon's debt to the Scarpa Crew. The recorded conversation between the two at Mike's Candy Store on that occasion follows:
 
 
 91
 LEON: Hey John. Is Mario there?
 
 
 92
 PARLAGRECO: What?
 
 
 93
 LEON: Is Mario there?
 
 
 94
 PARLAGRECO: I don't know where he is.
 
 
 95
 LEON: You know where he is? What's up, dude? Can I leave you something?
 
 
 96
 PARLAGRECO: Yeah. What is it? (Unintelligible.)
 
 
 97
 LEON: Who do I leave it with?
 
 
 98
 PARLAGRECO: Dough?
 
 
 99
 LEON: Who do I leave it with?
 
 
 100
 PARLAGRECO: Gimme it, I'll--
 
 
 101
 LEON: Leave it with Mike?
 
 
 102
 PARLAGRECO: Leave it with me.
 
 
 103
 LEON: Okay, I'll do that.
 
 
 104
 * * * * * *
 
 
 105
 LEON: What's up, dude? Tell him I'll give him a call tonight.
 
 
 106
 PARLAGRECO: What?
 
 
 107
 LEON: Tell him I'll give him a beep tonight. Alright?
 
 
 108
 PARLAGRECO: Don't talk over the phone. (Unintelligible.)
 
 
 109
 LEON: No, no, I didn't know. Six thousand dollars. Tell him the eleven thousand is squashed from that. Tell him I'll give him a beep tonight and we'll straighten it out tommorrow.
 
 
 110
 Parlagreco: How much is there?
 
 
 111
 Leon: Six thousand.
 
 
 112
 Parlagreco: I ain't gotta count it, right?
 
 
 113
 Leon: No, uh, tell him I'll give him a call tonight.
 
 
 114
 * * * * * *
 
 
 115
 LEON: Alright. Tell, uh, tell Mario I'll beep him later.
 
 
 116
 PARLAGRECO: Alright.
 
 
 117
 LEON: I'll give him a call later. I want to straighten out a couple of things with him.
 
 
 118
 PARLAGRECO: Alright.
 
 
 119
 LEON: Alright?
 
 
 120
 PARLAGRECO: Alright.
 
 
 121
 LEON: I want to see if I can come back to work and all that shit. Alright, dude? I'll talk to you later.
 
 
 122
 PARLAGRECO: Alright. See you later, man.
 
 
 123
 LEON: Alright, John.
 
 
 124
 While J. Parlagreco contends that acceptance of the payment was only an innocent favor to his brother, the jury was entitled to conclude otherwise and view the acceptance of the payment as a further indication of J. Parlagreco's involvement in the conspiracy.
 
 
 125
 In sum, we believe that this evidence sufficed to establish J. Parlagreco's "demonstrated awareness of [the] conspiracy's existence coupled with his active participation," Torres, 519 F.2d at 726, and was accordingly sufficient to sustain J. Parlagreco's conviction on count seven. We further conclude that his presence in the candy store on the day Leon was beaten, when viewed in the context of the verbal exchanges which took place immediately before Leon was beaten and the subsequent payment of a portion of Leon's debt to J. Parlagreco, was sufficient to sustain J. Parlagreco's conviction on count eight.
 
 
 126
 2. Mario Parlagreco.
 
 
 127
 M. Parlagreco challenges the sufficiency of the evidence to sustain his conviction on count two for violation of 21 U.S.C. Sec. 848(a) (1988) by "engag[ing] in a continuing criminal enterprise," id. The pertinent provision is 21 U.S.C. Sec. 848(c) (1988), which provides:
 
 
 128
 For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if--
 
 
 129
 (1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
 
 
 130
 (2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter--
 
 
 131
 (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
 
 
 132
 (B) from which such person obtains substantial income or resources.
 
 
 133
 Specifically, M. Parlagreco contends that he "was not shown to have had a managerial or supervisory role over anyone, except perhaps his brother, [J. Parlagreco], whom he supposedly asked to do a favor and collect some money from Leon." The government, on the other hand, contends that there was ample evidence concerning the distribution of marijuana at the college spot to establish that M. Parlagreco was a supervisor, and that the operation employed at least five people.
 
 
 134
 The government points to the following testimony offered by Leon regarding the operation of the college spot:
 
 
 135
 Q Mr. Leon, when the spot was at its biggest about how many workers would be out there?
 
 
 136
 A Six or seven.
 
 
 137
 Q Did they have various job titles?
 
 
 138
 A Yes.
 
 
 139
 Q What were the various job titles?
 
 
 140
 A There was a chickey. A chickey is a lookout. They stand up on the hill and they just look for cops, and if they saw a cop they would either at the beginning we would have the blowhorns, and we would have whistles, then they would scream, and then we had walkie-talkie.
 
 
 141
 Q Besides the chickeys, what other type of workers were there?
 
 
 142
 A We had the runner and the dealers. The runners, they would take the money from the dealer, and bring it to me, and the dealers would just deal the dime bags. And sometimes it was really busy. We had--we had two dealers. One would take the money and the other one would deal the bags.
 
 
 143
 * * * * * *
 
 
 144
 Q Who would hire the workers who worked out at the College of Staten Island?
 
 
 145
 A Any of us.
 
 
 146
 Q When you say "any of us" who do you mean?
 
 
 147
 A Kevin Granato, Cosmo Catanzano, Billy Meli, Mario Parlagreco, Nicky DeCarlo, Lenny DeCarlo....
 
 
 148
 * * * * * *
 
 
 149
 Q Mr. Leon, who did you answer to at the college, who was your boss?
 
 
 150
 A My boss was Kevin Granato, Cosmo Catanzano, Mario Parlagreco, and Billy Meli.
 
 
 151
 Q What would they do, what was their job at the college, what was Mr. Granato's, Mr. Parlagreco's, Mr. Meli's and Mr. Catanzano's job at the college?
 
 
 152
 A To make sure that--they made sure that the business went right and if there was any kind of trouble that they would handle it.
 
 
 153
 "The operative concepts used in section 848--'organize,' 'supervise,' and 'manage'--are not technical, and we see no reason to give them other than their everyday meanings." United States v. Mannino, 635 F.2d 110, 117 (2d Cir.1980). Further, a defendant "need not have been the dominant organizer or manager as long as [he] was in some managerial position." United States v. Losada, 674 F.2d 167, 174 (2d Cir.), cert. denied, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982).
 
 
 154
 Viewing the cited evidence in light of these principles, we conclude that the jury was entitled to determine that M. Parlagreco occupied a managerial role in the charged narcotics enterprise within the meaning of section 848.
 
 
 155
 3. Cosmo Catanzano.
 
 
 156
 The Indictment specifies as the third predicate act of racketeering under count one that between January 6, 1987 and March 20, 1987, Granato and Catanzano conspired to distribute cocaine hydrochloride and heroin hydrochloride in violation of 21 U.S.C. Sec. 846 (1988). As hereinabove stated, Granato and Catanzano were convicted of this conspiracy, as well as of related distributions of cocaine and heroin, in a prior trial, and their judgments of conviction were received in evidence in the trial leading to the convictions which are the subject of the instant appeal. The activity in question was six separate sales of heroin and cocaine to one Anthony DeBiase, who unwittingly resold the narcotics to undercover officers.
 
 
 157
 Catanzano now contends that this predicate act "was blatantly lacking a nexus to the charged enterprise and thus it was insufficient to serve as a 'predicate' act for his conviction on the RICO charge herein."[7] The government responds that while "Catanzano seeks to divorce his participation in the 1987 DeBiase narcotics sales from his other criminal activities in 1986 by emphasizing their separation in time," the jury "could reasonably have concluded ... that the DeBiase sales were in fact related to Catanzano's continued membership in the Scarpa Crew."
 
 
 158
 Catanzano wisely does not challenge the sufficiency of the evidence to establish the existence of the conspiracy charged as predicate act three. This evidence consisted, in addition to the prior judgments of conviction, of testimony by DeBiase and the undercover agents involved in the DeBiase transactions. Rather, Catanzano stresses DeBiase's inability to identify the source of the cocaine and heroin provided to DeBiase by Granato and Catanzano, and claims that this compels the "unescapable [sic] conclusion ... that there was no connection to the enterprise established."
 
 
 159
 We reach a different conclusion. Leon testified as follows regarding the Scarpa Crew's initial involvement in cocaine sales:
 
 
 160
 Q Did there come a time, Mr. Leon when you had a conversation with one or more of the defendants about cocaine?
 
 
 161
 A Yes, I did.
 
 
 162
 Q When was this conversation? Were you working at the college at this point?
 
 
 163
 A Yes.
 
 
 164
 Q Who did you have this conversation with?
 
 
 165
 A Kevin Granato and Mario Parlagreco.
 
 
 166
 Q Anyone else present?
 
 
 167
 A No.
 
 
 168
 Q What was said during the course of the conversation?
 
 
 169
 A Business was really down and I asked Kevin anything we could do to make more money, and he said "What do you have in mind." I said "Why don't we sell cocaine." So he said "Are you sure you can get rid of it?" I said "Yes." He said "Well, I got this connection in New Jersey and this guy will front me," front is trust me, "two or three kilos at a shot."
 
 
 170
 Q So after that conversation, what happened?
 
 
 171
 A Well, the next day Kevin Granato said "I'll pick you up at your house"; me, Kevin Granato and Mario Parlagreco jumped in the car; shot out to Staten Island; Kevin said "This guy is going to bring down a kilo of cocaine" and we met in Staten Island behind a restaurant. I don't remember the name of the restaurant, but we went to this guy Eddie's house, I don't know his last name, but it was like three houses away from the restaurant and we went up to the house, then me and Kevin came down, Mario stood up there, and we met the guy behind the restaurant. The guy pulled up in a station wagon, don't remember the guy's name, and he told Kevin--got out of the car, he told Kevin Granato "I only have a half kilo." Kevin said "That's fine." And he said "I'll bring the other half tomorrow." Okay, we'll talk later, jumped back in the car. He jumped in the car, left and we went to Eddie's house.
 
 
 172
 In addition, LaFaro testified that when he went to the Parkway Luncheonette to make the first weekly $1,000 protection payment to the Scarpa Crew, he was told by Granato and M. Parlagreco (to whom he made the payment) that "we got cocaine if you need cocaine."
 
 
 173
 In sum, substantial evidence was provided that the Scarpa Crew engaged in the distribution of cocaine and heroin, as well as marijuana. Granato and Catanzano were indisputably part of the Scarpa Crew at the time of the DeBiase transactions. Accordingly, we place little weight on DeBiase's inability to specify the source of the narcotics that he purchased from Granato and Catanzano, and conclude that the evidence linking these sales to the Scarpa Crew sufficed to justify the jury's verdict that the third predicate act of racketeering was part of the "conduct of the affairs of the [Scarpa Crew,]" as charged in count one of the Indictment. See United States v. Salerno, 868 F.2d 524, 533-34 (2d Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 3192, 105 L.Ed.2d 700 (1989), --- U.S. ----, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989).
 
 
 174
 4. Nunzio DeCarlo.
 
 
 175
 DeCarlo claims that the evidence was insufficient to establish that the fourth racketeering act of count one, the murder of Albert Nocha in violation of N.Y.Penal Law Secs. 125.25 and 20.00 (McKinney 1988), was proven as to him. He points to recorded telephone conversations between him and undercover detective Murano in which DeCarlo raised the subject of the Nocha murder and consistently denied any role in the killing, and generally assails the government's evidence as too weak to warrant the submission of this issue to the jury.
 
 
 176
 The government points out that on the afternoon of the murder, DeCarlo unavailingly requested Murano to direct narcotics enforcement activity away from the college spot to a different part of Staten Island that evening. Further, the government stresses the extensive testimony by Leon connecting DeCarlo to Nocha's murder.
 
 
 177
 Leon testified that Nocha was selling marijuana at Clove Lake Park, in the vicinity of the college spot and therefore in competition with the Scarpa Crew. Leon stated that he had confronted Nocha concerning the matter, and DeCarlo subsequently did so, but Nocha refused to terminate his activities. Leon further testified that he assisted DeCarlo in arranging for a car to be stolen for use in connection with the Nocha murder, and that, in a departure from normal practice, none of his superiors in the Scarpa Crew accompanied Leon to the college spot the evening that Nocha was slain. Most importantly, Leon provided the following testimony concerning the events of that evening:
 
 
 178
 A Just went on, 9 o'clock I stood there for awhile, counted the money. And Nicky DeCarlo pulls up.
 
 
 179
 Q What happened?
 
 
 180
 A He tells me--he goes--what are you still doing here? I am going to pay the workers, going to Brooklyn in a little while.
 
 
 181
 He asked me for money. I said no. Did you guy do it?
 
 
 182
 Q What did you mean.
 
 
 183
 A Kill Nocha. He said yes. How did you do it?
 
 
 184
 A I shot him twice in the stomach and once in the face. I said you are crazy. Everybody is going to be in Pastels, a night club. That is where everybody is going to be.
 
 
 185
 Q Is that what Nicky DeCarlo said to you?
 
 
 186
 A Yes.
 
 
 187
 * * * * * *
 
 
 188
 Q Did you have another conversation?
 
 
 189
 A The same night and he asked me to give him all the issues and the money that Kevin Granato wanted it. Kevin Granato told me don't ever give nothing to Nicky. I told Nicky no.
 
 
 190
 We went on the conversation about the Nocha murder. I said what are you doing out here, ain't you scared? He said no, once you kill your first you get scared for two days, now you get used to it.
 
 
 191
 DeCarlo points to various assorted inconsistencies in Leon's testimony, and weaknesses therein allegedly exposed in cross-examination. His burden, however, is to establish that Leon's testimony concerning two explicit admissions of the Nocha murder by DeCarlo was so incredible that the jury should not have been permitted to consider it or to reach a verdict consistent with it. He has not done so. We conclude that the evidence was sufficient to support the jury's verdict on this issue.
 
 
 192
 B. Surveillance Tapes.
 
 
 193
 Prior to trial, the government disclosed that in March, 1986, in connection with a separate investigation, the office of the Kings County district attorney had obtained authorization to install an eavesdropping device in the Wimpy Boys Social Club (the "Club"), which was adjacent to the Parkway Luncheonette at 75th Street and 13th Avenue in Brooklyn. The Scarpa Crew congregated frequently at the Club, and the government introduced at trial both still photographs and silent videotapes of members of the Scarpa Crew in the vicinity of the Club, as well as of the Club and its environs. The warrant obtained by the Kings County district attorney was extended several times, and electronic surveillance tape recordings were created over a period of months as a result.
 
 
 194
 In January, 1988, the Government informed the district court and defense counsel that it had been offered copies of these tape recordings by the Kings County district attorney, and that the tapes might contain evidence relevant to the charges in the indictment. On January 19, 1988, the government obtained the tapes, and government representatives began to review them to determine their relevance to the case.
 
 
 195
 Granato, Catanzano and M. Parlagreco subsequently moved for production of the tape recordings pursuant to Fed.R.Crim.P. 16(a)(1)(A) and (C) and Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The government responded that it had completed its review of the tapes, and they were not discoverable under either rule 16 or Brady. In opposition to the motion, the government submitted, in camera, a sealed affidavit by the assistant United States attorney who had supervised the review of the tape recordings which included detailed summaries and excerpts from transcripts of the tape recordings. The sealed affidavit also appended the warrants authorizing the surveillance, and an affidavit by a government agent who had reviewed the tapes.
 
 
 196
 The government represented that the only statements on the tapes relating to the crimes charged in the Indictment were made by individuals other than the defendants. It also stated that while the tape recordings did contain statements by the defendants, those statements were either innocuous or relevant only to crimes not charged in the Indictment. The government also represented that the tapes did not contain any exculpatory material subject to production under Brady.
 
 
 197
 By memorandum and order dated May 16, 1988, the district court denied the motion for production of the tape recordings. Relying upon its in camera review of the sealed affidavit, the court concluded that the Government had made an adequate showing that the tapes were neither "relevant" within the meaning of rule 16(a)(1)(A) nor "material to the preparation of the defendant's defense" within the meaning of rule 16(a)(1)(C), and did not contain Brady material. The court stated:
 
 
 198
 [T]he movants contend that the very innocuousness of the statements renders them relevant as they are probative of the defendants' innocence. As the government points out, however, the movants are effectively arguing that the very irrelevance of these statements makes them relevant. The defendants cannot hope to use a process of elimination to defend themselves by presenting evidence of their noncriminal activities. Such evidence would only be relevant if the indictment charged them with ceaseless criminal conduct. Furthermore, the government convincingly explains the lack of inculpatory evidence on the tapes as the result of minimization efforts by the Kings County District Attorney, and the technical limitations of the eavesdropping device.
 
 
 199
 At trial, after the government had rested its case, the defense sought to present evidence, by way of testimony or stipulation, of the existence of the bug and the absence of relevant intercepted conversations by the defendants. The district court denied the application.
 
 
 200
 On appeal, Granato, Meli and Savarese renew the contention that the tapes were discoverable and that the district court erred in not ordering their discovery or permitting testimony concerning them. The identical argument was presented, and rejected, on Scarpa's appeal, which was heard by the panel to which the instant appeal was argued. See United States v. Scarpa, 897 F.2d 63, 70 (2d Cir.1990), petition for cert. filed, No. 89-1856 (U.S. May 24, 1990). We there said:
 
 
 201
 Rule 16 of the Federal Rules of Criminal Procedure requires disclosure by the government of "any relevant written or recorded statements made by the defendant ... within the possession, custody or control of the government." Fed.R.Crim.P. 16(a)(1)(A). " '[D]eterminations of relevance are entrusted to the sound discretion of the trial judge, and his decision will not be overturned unless he has acted arbitrarily or irrationally.' " United States v. Diaz, 878 F.2d 608, 614 (2d Cir.1989) (quoting United States v. Cruz, 797 F.2d 90, 95 (2d Cir.1986)), cert. denied, --- U.S. ----, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989).
 
 
 202
 Scarpa contends that the absence of incriminating statements on the tapes is relevant in the sense that it tends to disprove the government's theory that the defendants congregated at the Wimpy Boys Club to discuss the marijuana business. Scarpa contends also that the tapes would support his contention that his illicit income came from gambling, rather than from drugs.
 
 
 203
 A defendant may not seek to establish his innocence, however, through proof of the absence of criminal acts on specific occasions. See United States v. O'Connor, 580 F.2d 38, 43 (2d Cir.1978); United States v. Shapiro, 159 F.2d 890, 891 (2d Cir.1947), aff'd, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948); see also 1A Wigmore on Evidence Sec. 56.1 (Tillers rev. 1983). The district court found that the tapes contained conversations which were "either wholly innocuous or involve[d] criminality that has nothing to do with the crimes charged in this case." The absence of drug conversations is consistent with testimony by the cooperating witnesses that drugs were never discussed inside the Club. Thus, the district court appropriately refused to order disclosure of the tapes. See United States v. McElroy, 697 F.2d 459, 464 (2d Cir.1982) ("Rule 16 thus does not cover oral statements unrelated to the crime charged or completely separate from the Government's trial evidence.").
 
 
 204
 Id.
 
 
 205
 We find no occasion to add to this analysis, and conclude that the district court did not err in its rulings concerning these tape recordings.
 
 
 206
 C. Reference to "the Colombo Organized Crime Family" in the Indictment.
 
 
 207
 The first paragraph of count one of the Indictment reads as follows:
 
 
 208
 From in or about July 1985 and continuing until the date of filing this indictment, the defendant GREGORY SCARPA, JR., headed an enterprise, the goal of which was to raise money through the trafficking of narcotics and other controlled substances, and extortion. The SCARPA enterprise, commonly referred to as his "CREW" and hereinafter referred to as the "SCARPA CREW", reported to the Colombo Organized Crime Family.
 
 
 209
 Emphasis added.
 
 
 210
 Prior to trial, Granato moved to strike the reference to the Colombo Organized Crime Family from the indictment pursuant to Fed.R.Crim.P. 7(d), which provides that "[t]he court on motion of the defendant may strike surplusage from the indictment," on the basis that the Scarpa Crew, and not the Colombo Organized Crime Family, was the enterprise alleged in the Indictment. The government opposed the motion, claiming that "this allegation is necessary to its case because the Scarpa Crew derived its existence and organization from its association with the Colombo Family." At the hearing on the motion, the government assured the court that the Colombo Organized Crime Family "serves to identify the crew, the crew is a branch of the family and there will be testimony to that effect from some of our witnesses."
 
 
 211
 The district court denied the motion in its memorandum and order dated May 16, 1988, stating:
 
 
 212
 Since the government asserts that the Scarpa Crew's alleged connection to the Colombo Family is relevant to the identity and character of the RICO enterprise charged in the indictment, the reference to the Colombo Family should not be stricken even though the Colombo Family itself is not the alleged enterprise. At the government's suggestion, however, the court adopts the procedure discussed in United States v. Castellano, 610 F.Supp. 1359, 1428-29 (S.D.N.Y.1985) and United States v. Persico, 621 F.Supp. 842, 861 (S.D.N.Y.1985). The defendant may renew his motion after the presentation of the government's case if it fails to offer proof of the alleged connection between the Scarpa Crew and the Colombo Family. If the motion is granted, the court will give appropriate instructions to the jury.
 
 
 213
 Evidence relating to the Scarpa Crew's connection to the Colombo Organized Crime Family was presented by two witnesses at trial. The first reference came in testimony by Christopher Gaeta ("Gaeta"), an imprisoned felon who conversed with several of the defendants at the Metropolitan Correctional Center in Manhattan at the time of their arrest in November, 1987. Gaeta testified:
 
 
 214
 Q Did Bill Meli have any conversation with you in the presence of someone named Sally Crash (ph)?
 
 
 215
 A At one point when they first got there, they he--there was a gentleman Sally Crash an old timer that owned a bar on 86th. I believe it was Mario who said do I--he asked me if I knew salary cash [sic] was a wiseguy. I said I'm not sure, I think he is. Billy says that he past--Billy Meli said the comment that he said--
 
 
 216
 MR. BRONSON: Objection.
 
 
 217
 THE COURT: Overruled.
 
 
 218
 THE WITNESS: He said the way he said that, the comment he past [sic] must mean he's a wiseguy, he got to be made but if--
 
 
 219
 Q Go on?
 
 
 220
 A But if he got a place on 86th he got to be with us, he must be with the Columbo's [sic].
 
 
 221
 Q What did you understand the term wiseguy to mean?
 
 
 222
 A A wiseguy, a good fellow, a made member of the Mafia.
 
 
 223
 Q What does "made" mean?
 
 
 224
 A You are strained out, you are a wiseguy.
 
 Subsequently, Leon testified as follows:
 
 225
 Q Did you ever have any conversations with any of the defendants about the Scarpa crew?
 
 
 226
 A Yes.
 
 
 227
 Q With Nicky De Carlo?
 
 
 228
 A Yes.
 
 
 229
 Q What did--do you recall when the conversation was?
 
 
 230
 A I was working in the college at the time.
 
 
 231
 Q Sometime during that time period while working in the college?
 
 
 232
 A Yes.
 
 
 233
 Q Do you recall where the conversation was?
 
 
 234
 A Took place in his car, we were driving around.
 
 
 235
 Q What did Nicky DeCarlo tell but [sic] the Scarpas [sic] Crew is?
 
 
 236
 A He was telling me that, you know--me and Patrick Brennan weren't too good pals, Nicky said don't worry you are with Greg now and Greg is a Capo of the Colombo Crime Family and you are with him and he is going to talk to Greg about it.
 
 
 237
 Following the government's case, appellants renewed the rule 7(d) motion and moved in the alternative for a mistrial. The district court denied the motion. On appeal, Meli and Savarese contend that (1) the rule 7(d) motion should have been granted, (2) cited testimony concerning the Colombo connection should have been excluded as prejudicial pursuant to Fed.R.Evid. 403, or (3) a mistrial should have been declared.
 
 
 238
 We disagree. Motions to strike surplusage from an indictment will be granted only where the challenged allegations are "not relevant to the crime charged and are inflammatory and prejudicial." United States v. Napolitano, 552 F.Supp. 465, 480 (S.D.N.Y.1982) (citing authorities). "[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." United States v. DePalma, 461 F.Supp. 778, 797 (S.D.N.Y.1978). In RICO cases, courts have refused to strike allegations of organized crime connections that "serve to identify the 'enterprise' and the means by which its members and associates conduct various criminal activities." Napolitano, 552 F.Supp. at 480; see also United States v. Rastelli, 653 F.Supp. 1034, 1055 (E.D.N.Y.1986); United States v. Santoro, 647 F.Supp. 153, 176-77 (E.D.N.Y.1986), aff'd mem., 880 F.2d 1319 (2d Cir.1989).
 
 
 239
 In view of these authorities and the testimony at trial, we rule that appellants have not satisfied the "exacting standard," see 1 C. Wright, Federal Practice and Procedure Sec. 127, at 426 (1982), for a successful rule 7(d) motion. Nor do we perceive any error in the admission of testimony by Gaeta and Leon concerning the Colombo connection, especially since the district court's pretrial ruling presaged that such testimony would be provided (to test the validity of the allegation in the indictment) and no rule 403 objection was posed to the evidence when it was presented. Finally, in view of the foregoing, no reason was provided to declare a mistrial below, or to reverse here.
 
 
 240
 D. Stepladder Prosecution.
 
 
 241
 As noted earlier, Granato and Catanzano were previously convicted in the United States District Court for the Eastern District of New York on October 8, 1987, after a jury trial, of conspiracy to distribute heroin and cocaine between January and March, 1987, and of various related distributions. A corresponding conspiracy is charged as predicate act three of count one of the Indictment, and the prior judgments of conviction were introduced at trial below as evidence of that conspiracy. Catanzano contends on appeal that this process constitutes an impermissible "stepladder prosecution" in violation of his "Fifth Amendment Due Process rights." He analogizes to cases involving pre-indictment delay, contending that "[j]ust as pre-indictment delay transgresses the limits of Due Process when there is actual prejudice to the defendant's right to a fair trial and unjustifiable governmental conduct, such as deliberate delay to achieve a tactical advantage, a step ladder prosecution such as the government has instigated here likewise oversteps Due Process limits."
 
 
 242
 United States v. Persico, 774 F.2d 30, 32 (2d Cir.1985), held that offenses to which the defendants in that case had pled guilty in a separate prosecution could be charged as predicate acts in a subsequent prosecution for a RICO offense continuing after the plea to the prior offense. See also Garrett v. United States, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985) (same rule as to separate prosecution for engaging in a continuing criminal enterprise extending beyond the plea to the prior offense in violation of 21 U.S.C. Sec. 848).[8] Catanzano does not challenge this rule, but contends that the government utilized it unfairly and manipulatively, deliberately delaying the instant prosecution while meanwhile securing the convictions of Catanzano and Granato for their (accordingly illegitimate) use herein.
 
 
 243
 We disagree. As a general matter, a prosecutor is "justified in not seeking the indictment until ... convinced that there [will] be sufficient evidence to prove guilt beyond a reasonable doubt." United States v. Rubin, 609 F.2d 51, 66 (2d Cir.1979), aff'd, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981). Moreover, "[t]o establish denial of due process based on excessive pre-indictment delay [a defendant] bears the heavy burden ... of showing not only that he was prejudiced by the delay but that it was so unfair as to violate fundamental concepts of fair play and decency, such as would occur if the prosecutor deliberately used the delay to achieve a substantial tactical advantage." Id. (citing United States v. Lovasco, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977)); see also United States v. Ruggiero, 726 F.2d 913, 925 (2d Cir.) (defendant "failed to show either actual prejudice or unjustifiable governmental conduct, such as deliberate delay to achieve a substantial tactical advantage"), cert. denied, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984).
 
 
 244
 No such showing has been made here. Catanzano provides no specific allegation of misconduct on the part of the prosecution, relying instead on an "unavoidable deduction" of deliberate delay. In response, the government provides specific, convincing reasons why the prosecution was not ready to try this case until the spring of 1988. See Grady, 110 S.Ct. at 2090 n. 7. Accordingly, no basis for reversal is presented.
 
 
 245
 E. Severance of Savarese.
 
 
 246
 Savarese, whose motion for severance was denied at trial, claims error in that denial, invoking Fed.R.Crim.P. 14. Rule 14 provides in pertinent part: "If it appears that a defendant ... is prejudiced by a joinder of offenses or of defendants in an indictment ... or by such joinder for trial together, the court may ... grant a severance of defendants or provide whatever other relief justice requires." Savarese contends that his extortion charges were only a minor part of the trial, and that since most of the evidence presented, particularly regarding the marijuana and other narcotics trafficking, had nothing to with his case, severance should have been granted as to him.
 
 
 247
 The decision whether to grant a severance, however, is "committed to the sound discretion of the trial judge." United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir.1989) (citing United States v. Chang An-Lo, 851 F.2d 547, 556 (2d Cir.), cert. denied, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988)); see also United States v. Nersesian, 824 F.2d 1294, 1303 (2d Cir.), cert. denied, 484 U.S. 957, 958, 1061, 108 S.Ct. 355, 357, 1018, 98 L.Ed.2d 380 (1987). "[A] denial of such a motion will be reversed only upon a showing of clear abuse of that discretion." Chang An-Lo, 851 F.2d at 556; see also Casamento, 87 F.2d at 1149; Nersesian, 824 F.2d at 1303. A defendant seeking to overturn a denial of a severance motion, furthermore, must show that he was " 'so severely prejudiced by a joint trial that it ... in effect den[ied] him a fair trial ..., not that he might have had a better chance for acquittal at a separate trial.' " United States v. Burke, 700 F.2d 70, 83 (2d Cir.) (quoting United States v. Rucker, 586 F.2d 899, 902 (2d Cir.1978)), cert. denied, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983).
 
 
 248
 In this case, no such showing has been made. Much of the evidence admitted at trial relating to the marijuana activity would have been admissible against Savarese even in a separate trial because Leon, the victim of Savarese's extortion, fell into debt as a result of his participation in that activity. In any event, " 'differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials.' " Chang An-Lo, 851 F.2d at 557 (quoting United States v. Carson, 702 F.2d 351, 366-67 (2d Cir.), cert. denied, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983)). We conclude that Savarese has failed to establish error in the district court's denial of his motion for a severance.
 
 
 249
 F. Evidentiary Rulings.
 
 
 250
 Several of the district court's evidentiary rulings are challenged on appeal. Before turning to appellants' specific claims, we recognize "the long held view of this Circuit that the trial judge is in the best position to weigh competing interests in deciding whether or not to admit certain evidence." United States v. Sun Myung Moon, 718 F.2d 1210, 1232 (2d Cir.1983) (citing United States v. Birney, 686 F.2d 102, 106 (2d Cir.1982)), cert. denied, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984). "Absent an abuse of discretion, the decision of the trial judge to admit or reject evidence will not be overturned by an appellate court." Id. (citing Birney, 686 F.2d at 106).
 
 
 251
 1. The Newspaper Article.
 
 
 252
 On cross examination, M. Parlagreco's lawyer attempted to impeach Leon by questioning him about a recorded conversation between Leon and another drug dealer, Anthony Canale, in which Leon used the phrase "strong arm ... Nicky DeCarlo." M. Parlagreco's attorney sought to establish that Leon was encouraging Canale to extort money from DeCarlo, thereby refuting Leon's claim that he had been fearful of, and extorted by, the Scarpa Crew, including DeCarlo.
 
 
 253
 On redirect-examination, Leon refuted this implication, contending that "strong arm" was DeCarlo's nickname, and that he was using the words in that sense, rather than as a verb, in the recorded conversation. Leon recounted that DeCarlo assumed the nickname "strong arm" after a newspaper article in the Staten Island Advance described DeCarlo as the "strong arm" of the Scarpa Crew. Leon alleged that DeCarlo carried the article in his pocket. At this juncture, the government offered the article, in redacted form, in evidence. Over the objection of DeCarlo's attorney, the court allowed its admission, stating:
 
 
 254
 Mr. Fisher introduced a tape into evidence in which he had the jury listen to the word "strong-arm" suggesting that this witness asked Anthony Canale to strong-arm Nicky DeCarlo.
 
 
 255
 And this witness said no, that is not what happened at all. The words strong-arm was a nickname of Nicky DeCarlo. That explanation was the subject, to put it mildly, of derision, DERISION, and disbelief, suggesting to this jury that this witness has at that very moment fabricated that explanation of the world [sic] strong-arm.
 
 
 256
 And that it was an explanation which was made out of the whole cloth.
 
 
 257
 Now it seems to me, Miss Kellman, that it ought to be perfectly proper for the prosecutor to show that wasn't a lie.
 
 
 258
 In fact, he had that nickname and this is how he got it. That is his testimony.
 
 
 259
 I will admit it not for the truth, and I will instruct the jury. I will admit that portion of the article for the purpose of indicating that it was said there.
 
 
 260
 On appeal, DeCarlo contends that the district court improperly admitted the redacted newspaper article, claiming that it does not meet the relevance test of Fed.R.Evid. 401, and further that even if it does, its probative value was "substantially outweighed by the danger of unfair prejudice" within the meaning of Fed.R.Evid. 403.
 
 
 261
 Under rule 401, evidence is relevant if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." " '[D]eterminations of relevance are entrusted to the sound discretion of the trial judge, and his decision will not be overturned unless he has acted arbitrarily or irrationally.' " United States v. Diaz, 878 F.2d 608, 614 (2d Cir.) (quoting United States v. Cruz, 797 F.2d 90, 95 (2d Cir.1986)), cert. denied, --- U.S. ----, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989).
 
 
 262
 There was nothing arbitrary or irrational about the district court's ruling. It had become an issue of consequence, with respect to Leon's credibility, whether DeCarlo had assumed the nickname "strong arm." Since Leon alleged that the nickname was assumed as a result of the article, it was appropriate to introduce the article into evidence to confirm Leon's contention. "Confirmatory evidence is relevant since it aids the jury in evaluating the probative force of other evidence offered to prove a material fact." United States v. Iaconetti, 406 F.Supp. 554, 557 (E.D.N.Y.), aff'd, 540 F.2d 574 (2d Cir.1976), cert. denied, 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 1041 (1977).
 
 
 263
 We also reject DeCarlo's alternative contention that the article was unduly prejudicial. Fed.R.Evid. 403 provides that: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." "The trial judge must weigh the probative value of the evidence against its tendency to create unfair prejudice and his determination will rarely be disturbed on appeal." United States v. Ravich, 421 F.2d 1196, 1203-04 (2d Cir.), cert. denied, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970). "Absent an abuse of ... discretion, the decision of the trial judge must stand." United States v. Birney, 686 F.2d 102, 106 (2d Cir.1982). Further, "[i]n assessing the risk of prejudice against the defendant, the trial court should carefully consider the likely effectiveness of a cautionary instruction that tries to limit the jury's consideration of the evidence to the purpose for which it is admissible." United States v. Figueroa, 618 F.2d 934, 943 (2d Cir.1980).
 
 
 264
 In this case, the following limiting instruction was given:
 
 
 265
 Do you recall I also told you there are times when evidence may be received for a limited purpose? For example, a statement, although it is an out of court statement, may be received not for the purpose of establishing the truth of the statement, but simply for the purpose of establishing that the statement was made. That it was said.
 
 
 266
 I am receiving Government's Exhibit 56 not for the purpose of attempting to establish the truth of what is contained in that article, but simply for the purpose of establishing that what it contains was said.
 
 
 267
 Irrespective of truth or falsity, it is not being received for truth, only for the purpose of establishing that it was said. All right?
 
 
 268
 So, it is being received for a limited purpose. That purpose.
 
 
 269
 Clearly, the district court took considerable precautions to assure that no undue prejudice attended the introduction of the article--it was redacted and the jurors were given a limiting instruction. Further, the issue to which the article was relevant resulted from the defense's cross-examination of Leon. Under the circumstances, we discern no error in the admission of the redacted article in evidence.
 
 
 270
 2. Excited Utterance.
 
 
 271
 While at Maimonides Hospital following his beating by the Scarpa Crew, and just after his sister screamed when DeCarlo came to the emergency room, Leon told detective Rodenburg that he had been beaten by members of the Crew, naming (according to Rodenburg) Mario and John "Pellegrino," Granato, DeCarlo, "Meli or Miley" and Scarpa. At trial, Leon testified that he had made a statement to Rodenburg, but could no longer recall what he had said. Rodenburg was then allowed to testify about what Leon had said to him. The defense made a hearsay objection, but the district court admitted the testimony on the basis of the excited utterance exception to the hearsay rule stated in Fed.R.Evid. 803(2) (excepting "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition"). In so ruling, the court said:
 
 
 272
 I think there's no question about the fact that the event here was a startling event and that the declarant is under stress or excitement caused by the event or condition and there's no question but that the testimony in this case reveals somewhere around 1237 or 38 of the transcript that while Leon was lying at the hospital, he heard screaming that was his sister screaming and his sister was screaming, apparently, by virtue of the fact that Nicky DeCarlo had walked into the hospital. Leon said that he was so nervous they were going to finish the job and kill him that he then proceeded to talk to the police.
 
 
 273
 On appeal, Granato and Catanzano claim that the lapse of five or six hours between the beating and the Rodenburg interview served to alleviate the stress of excitement, and that the appearance of DeCarlo at the hospital did not renew the stress. They accordingly claim that Rodenburg's testimony concerning Leon's statement was improperly admitted.
 
 
 274
 We disagree. An excited utterance need not be contemporaneous with the startling event to be admissible under rule 803(2). See, e.g., United States v. Kearney, 420 F.2d 170, 171, 174-75 (D.C.Cir.1969) (twelve-hour delay); Guthrie v. United States, 207 F.2d 19, 22-23 (D.C.Cir.1953) (eleven-hour delay). The length of time between the event and the utterance is only one factor to be taken into account in determining whether the declarant was, within the meaning of rule 803(2), "under the stress of excitement caused by the event or condition." See Gross v. Greer, 773 F.2d 116, 119-20 (7th Cir.1985) (court properly admitted evidence of statement made twelve hours after startling event).
 
 
 275
 There is little doubt that at the time Leon gave the statements to Detective Rodenburg, he was still under the stress of excitement caused by his beating at the candy store, and by his sister's screams when DeCarlo appeared at the hospital. This is borne out by Rodenburg's testimony:
 
 
 276
 Q How would you describe [Leon's] demeanor at that time?
 
 
 277
 A He was very nervous. He was conscious. He had been beat up, severely beaten up.
 
 
 278
 Under these circumstances, there was an adequate basis for admitting evidence of Leon's statement pursuant to rule 803(2).
 
 
 279
 3. Cross-Examination of Leon.
 
 
 280
 The government made a pretrial motion, which was partially granted, to limit cross-examination of certain of its witnesses pursuant to Fed.R.Evid. 608 and 609. On appeal, Meli and Savarese contend that the district court improperly precluded cross-examination of Leon regarding his involvement in an attempted contract murder.
 
 The district court ruled:
 
 281
 Defendants ... contend that Leon's involvement in the attempted contract murder is probative of untruthfulness principally because he did not disclose it to the government during the period of his cooperation when first questioned about his prior criminal conduct. The court, however, finds that this omission is probative not so much of untruthfulness, but of Leon's fear of self-incrimination. In fact, according to the government, Leon only recently received use immunity from the Kings County District Attorney....
 
 
 282
 The government has also revealed that Leon lied to one of his co-conspirators during the attempted contract murder.... The government recognizes that this act is somewhat probative of Leon's truthfulness. Yet, the court determines that the potential probative value of Leon's testimony in response to cross-examination on this act is substantially outweighed by the danger that the jury will be unfairly prejudiced against Leon when the underlying criminal conduct is necessarily exposed. Fed.R.Evid. 403. Accordingly, the government's motion for a ruling in limine is granted to the extent discussed above.
 
 
 283
 It is settled that "[t]he scope and extent of cross-examination lies within the discretion of the trial judge." United States v. Blanco, 861 F.2d 773, 781 (2d Cir.1988), cert. denied, 489 U.S. 1019, 109 S.Ct. 1139, 103 L.Ed.2d 200 (1989). A trial judge does not abuse his discretion by curtailing cross-examination as long as the jury has "sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government." United States v. Singh, 628 F.2d 758, 763 (2d Cir.), cert. denied, 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980).
 
 
 284
 During trial, the district court permitted broad cross-examination of the government's witnesses, and of Leon in particular. Leon was examined concerning his prior arrests for marijuana possession and distribution and his other involvement in drug dealing, including marijuana and cocaine, even after his agreement to cooperate with the government; several burglaries and thefts; credit card fraud; sale of stolen goods; and arson, again after agreeing to cooperate with the government. He was also questioned about his agreement with the government, and the amounts of money he had received from the government for his cooperation.
 
 
 285
 Especially in view of this searching cross-examination, the district court did not abuse its discretion by precluding inquiry into Leon's involvement in the attempted contract murder.
 
 
 286
 G. Jury Instructions.
 
 
 287
 Appellants claim that error occurred in the district court's instructions on the RICO and section 848 counts. Before turning to their specific claims, we consider the principles governing our review. It is a "well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S.Ct. 396, 400-01, 38 L.Ed.2d 368 (1973) (citing Boyd v. United States, 271 U.S. 104, 107, 46 S.Ct. 442, 443, 70 L.Ed. 857 (1926)); see also United States v. Park, 421 U.S. 658, 674-75, 95 S.Ct. 1903, 1912-13, 44 L.Ed.2d 489 (1975). "Often isolated statements taken from the charge, seemingly prejudicial on their face, are not so when considered in the context of the entire record of the trial." United States v. Birnbaum, 373 F.2d 250, 257 (2d Cir.), cert. denied, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967).
 
 
 288
 1. RICO Instruction.
 
 
 289
 Count one of the indictment charged five defendants with a violation of 18 U.S.C. Sec. 1962(c) (1988), which proscribes conducting the affairs of a RICO enterprise "through a pattern of racketeering activity," id., and specified eight predicate acts of racketeering activity. 18 U.S.C. Sec. 1961(5) states that " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."
 
 
 290
 The district court's charge concerning the phrase "pattern of racketeering activity" tracked the language of section 1961(5), and then added that "the government is required to prove that the unlawful or racketeering acts were in some way related to the activities of the enterprise or that the defendant was able to commit the acts solely by virtue of his position in the enterprise." Granato contends on appeal that this instruction improperly failed to include the requirement of relationship and continuity among the predicate acts alleged in the indictment. This requirement was established in this circuit by United States v. Indelicato, 865 F.2d 1370 (2d Cir.) (in banc), cert. denied, --- U.S. ----, 109 S.Ct. 3192, 105 L.Ed.2d 700 (1989), --- U.S. ----, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989), which was decided while this appeal was pending.
 
 
 291
 The government, noting that the instruction given was "in accordance with the controlling law of this Circuit at the time of trial," citing United States v. Ianniello, 808 F.2d 184 (2d Cir.1986), cert. denied, 483 U.S. 1006, 107 S.Ct. 3229, 97 L.Ed.2d 736 (1987), contends that Granato has waived this argument because it was not raised below.
 
 
 292
 In Ianniello, we considered the statement in Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), that " '[i]t is this factor of continuity plus relationship which combines to produce a pattern.' " 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 (quoting S.Rep. No. 617, 91st Cong., 1st Sess. 158 (1969)). We concluded that "when a person commits at least two acts that have the common purpose of furthering a continuing criminal enterprise with which that person is associated, the elements of relatedness and continuity which the Sedima footnote construes section 1962(c) to include are satisfied." 808 F.2d at 192. After the trial herein was concluded, however, this court, sitting in banc in Indelicato, overruled Ianniello, see 865 F.2d at 1382, holding:
 
 
 293
 that proof of two acts of racketeering activity without more does not suffice to establish a RICO pattern; that the concepts of relatedness and continuity are attributes of activity, not of a RICO enterprise, and that a RICO pattern may not be established without some showing that the racketeering acts are interrelated and that there is continuity or a threat of continuity; that a pattern may be established without proof of multiple schemes, multiple episodes, or multiple transactions; and that racketeering acts that are not widely separated in time or space may nonetheless, given other evidence of the threat of continuity, constitute a RICO pattern.
 
 
 294
 865 F.2d at 1381.
 
 
 295
 It is clear that appellants are entitled to have the direct appeal of their convictions decided in accordance with the law as it now stands (i.e., the rule stated in Indelicato ). See Griffith v. Kentucky, 479 U.S. 314, 322, 107 S.Ct. 708, 713, 93 L.Ed.2d 649 (1987); Hegger v. Green, 646 F.2d 22, 26 (2d Cir.1981). We have applied this rule in a number of cases to appeals during whose pendency the Indelicato overruling of Ianniello occurred. See, e.g., United States v. Kaplan, 886 F.2d 536, 541-43 (2d Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990); United States v. Gelb, 881 F.2d 1155, 1163-64 (2d Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989); United States v. Bortnovsky, 879 F.2d 30, 41 (2d Cir.1989); Proctor & Gamble Co. v. Big Apple Indus. Bldgs., Inc., 879 F.2d 10, 14-19 (2d Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 723, 107 L.Ed.2d 743 (1990).
 
 
 296
 This case poses, however, the special circumstance of a jury instruction that accorded with the rule of Ianniello but would have to be recast in order to satisfy Indelicato, and the government's claim that appellants made no objection to the instruction adequate to satisfy Fed.R.Crim.P. 30, which provides in pertinent part: "No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection."
 
 
 297
 We recently considered this precise question in United States v. Tillem, 906 F.2d 814 (2d Cir. June 19, 1990), concluding that where no objection meeting the requirement of Fed.R.Crim.P. 30 was made, a judgment of conviction would be reversed only upon a finding of "[p]lain error[ ] ... affecting substantial rights" within the meaning of Fed.R.Crim.P. 52(b). Id. at 824-26. We further determined in Tillem that there was no established circuit authority which would have rendered an objection to the challenged RICO instruction futile, thereby arguably excusing a failure to make such an objection. Id. at 825 (citing United States v. Mussachia, 900 F.2d 493, 501-02 (2d Cir.1990), and Indelicato, 865 F.2d at 1377-80, and rejecting applicability of rule of Ingber v. Enzor, 841 F.2d 450, 454-55 (2d Cir.1988)).
 
 
 298
 This panel is, of course, bound by the determination in Tillem. See United States v. Salerno, 868 F.2d 524, 534 (2d Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 3192, 105 L.Ed.2d 700 (1989), --- U.S. ----, 110 S.Ct. 56, 107 S.Ct. 24 (1989); Board of Educ. v. Hufstedler, 641 F.2d 68, 70 (2d Cir.1981); In re Jaylaw Drug, Inc., 621 F.2d 524, 527 (2d Cir.1980). We accordingly proceed to consider (1) whether a proper rule 30 objection was made to the district court's instruction on this issue, and if not, (2) whether that instruction nonetheless resulted in plain error within the meaning of rule 52(b).
 
 
 299
 In Tillem, no objection was made to the instruction challenged on appeal. Here, Granato claims that an objection sufficient to satisfy rule 30 was in fact made. The governing standard is clear. "To preserve a question for appellate review, the objection must direct the trial court's attention to the contention that is to be raised on appeal." United States v. Civelli, 883 F.2d 191, 194 (2d Cir.) (citing United States v. Lanza, 790 F.2d 1015, 1021 (2d Cir.), cert. denied, 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986)), cert. denied, --- U.S. ----, 110 S.Ct. 409, 107 L.Ed.2d 374 (1989).
 
 
 300
 The pertinent objection at the charging conference was as follows:
 
 
 301
 MS. KELLMAN: I would also ask with respect to the definition that the Court has outlined on pattern of racketeering, I understand that that this is the charge that has been used and accepted by the Circuit in the Ianello (ph) case. But I think that the Circuit has not limited in any way the possibility of using the charge that Judge Weinstein used in the Teitler case, and in that case I believe the Circuit approved language to the effect that in a racketeering conspiracy more is required than in a simple conspiracy. And the language goes on to talk about a relationship between--that the word "pattern" has its every day, no fancy meaning, but beyond that you have to find a relationship or a nexus between the acts and their use as a means of participating in the affairs of the enterprise.
 
 
 302
 The charge that the Court has here tracks the statutory language, but the charge in Teitler I believe is consistent with the language I suggested and I would request that the Court consider that request.
 
 
 303
 That's all I have.
 
 
 304
 THE COURT: I say what you are requesting at the bottom of page 76 and the top of page 77. It is in there.
 
 
 305
 MS. KELLMAN: Sorry about that. Maybe I just didn't see it.
 
 
 306
 I know the Court says through a pattern of racketeering activity. But it is the definition of "pattern".
 
 
 307
 THE COURT: Why don't you read on.
 
 
 308
 MS. KELLMAN: I apologize.
 
 
 309
 THE COURT: Anybody else wishes to be heard on the charge? Mr. Rappaport?
 
 
 310
 Granato contends that the statement: " 'pattern' has its everyday, no fancy meaning", taken in conjunction with the reference to United States v. Teitler, 802 F.2d 606, 614 (2d Cir.1986), resulted in an adequate rule 30 objection. Granato emphasizes that in Teitler there was a reference to Sedima footnote 14, and concludes that "the requested instruction did, in fact, seek precisely that which Indelicato subsequently mandated."
 
 
 311
 We are unpersuaded. The proper interpretation of Sedima footnote 14 has been the focal point of virtually all subsequent cases addressed to the "pattern" issue. Ianniello, furthermore, cited Teitler with approval regarding the interpretation of the pattern requirement. See Ianniello, 808 F.2d at 192. We are therefore unable to conclude that counsel's mention of Teitler, coupled with the comment that "pattern has its every day, no fancy meaning," sufficed to alert the district court not to charge in accordance with Ianniello, especially where counsel explicitly apologized for questioning the district court's intended instruction concerning the definition of "pattern" after the court specifically directed counsel's attention thereto. Indeed, it is difficult to review the transcript of the charging conference without concluding that whatever objection counsel proffered on this issue was ultimately withdrawn.
 
 
 312
 We therefore turn to the issue of plain error. As a general rule, failure to make an objection with adequate specificity to satisfy rule 30 may be disregarded under the "plain error" provision of rule 52(b) where failure to reverse would result in "a miscarriage of justice which denied the defendant a fair trial." Civelli, 883 F.2d at 194 (citing United States v. Kallash, 785 F.2d 26, 29 (2d Cir.1986) (citing United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982))). As the Civelli formulation makes clear, however, the plain error doctrine is to be used sparingly. See United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985); Frady, 456 U.S. at 163 n. 14, 102 S.Ct. at 1592 n. 14; Kallash, 785 F.2d at 29; United States v. Wilkinson, 754 F.2d 1427, 1432 (2d Cir.), cert. denied, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); United States v. London, 753 F.2d 202, 205 (2d Cir.1985).
 
 
 313
 We see no occasion for its application here. The district court's instruction required the jury to find that "there is a meaningful connection between the unlawful acts, between the racketeering acts of a defendant and the affairs of the enterprise," adding that "the government is required to prove that the unlawful or racketeering acts were in some way related to the activities of the enterprise or that the defendant was able to commit the acts solely by virtue of his position or involvement in the enterprise." The relatedness and continuity among the predicate acts themselves, required by Indelicato, is manifest on this record.
 
 
 314
 The jury found the following predicate acts proven against Granato, the only appellant who presses this issue on appeal (aside from adoptions of his argument by other appellants pursuant to Fed.R.App.P. 28(i)): a seven-month conspiracy with four other appellants to distribute marijuana; a seven-month conspiracy with one other appellant to distribute cocaine hydrochloride; a two-month conspiracy with one other appellant to distribute heroin hydrochloride and cocaine hydrochloride; a seven-month conspiracy with two other appellants to affect commerce by extortion; and a two-month conspiracy with four other appellants to extort money from Leon.[9] These acts were related not only to the affairs of the Scarpa Crew, the charged criminal enterprise, but among themselves. As the government contends, "All of Granato's predicate acts occurred within the two-year period charged in the Indictment, all had as their primary goal the making of money for the Scarpa Crew from narcotics-related activity, and all involved repeated criminal activity over a period of time."
 
 
 315
 Specifically, the narcotics activity was obviously inter-related; the seven-month extortion was conducted against other drug dealers whom Granato also offered to supply with narcotics; and the extortion of Leon related directly to the marijuana conspiracy and Leon's suspected purloining of proceeds therefrom. Continuity of the predicate acts is clear from the foregoing recital, expecially in view of the criminal nature of the charged enterprise. See Indelicato, 865 F.2d at 1383-84. A similar analysis is applicable to the other defendants convicted on the RICO count.
 
 
 316
 In sum, we discern no miscarriage of justice or denial of a fair trial warranting reversal of the convictions of Granato and his codefendants under count one of the Indictment. Accordingly, no plain error within the meaning of Fed.R.Crim.P. 52(b) occurred, and their RICO convictions must stand.
 
 
 317
 2. Section 848.
 
 
 318
 M. Parlagreco claims that the district court erred when it instructed the jury on the requirements for a violation of 21 U.S.C. Sec. 848(a) (1988) as alleged in count two of the indictment, pointing to the following portion of the charge:
 
 
 319
 If you're satisfied the first element [the commission of one of the narcotics violations charged in the indictment] has been proved beyond a reasonable doubt you must then also find that the Government proved beyond a reasonable doubt that this offense was part of a continuing series of violations of the federal narcotics laws.
 
 
 320
 Emphasis added. He contends that the court's use of the word "must" resulted in "remov[ing] from the jurors the right to find that the government had not proved a continuing series of violations by instructing them that they had to find such a series if they found the defendants had committed one of the drug felonies charged elsewhere in the indictment."
 
 
 321
 The government contends, and we concur, that read in context, the challenged instruction clearly states that the finding of a continuing series of narcotics violations is a separate element of the section 848 violation that "must" be found in order to render a guilty verdict, rather than that it necessarily follows from a finding that one or more narcotics felonies was committed. This conclusion is compelled by consideration of the instruction that preceded and followed the language challenged by M. Parlagreco.
 
 
 322
 In the paragraphs that preceded, the court instructed:
 
 
 323
 In Count Two, the defendants Gregory Scarpa, Junior, Kevin Granato, Mario Parlagreco are charged with conducting a continuing criminal enterprise. In effect the Government has charged that these defendants have engaged in the business of trafficking in prohibited drugs on a continuing, serious, widespread, supervisory and substantial basis. The Government must prove with respect to each of the defendants who are on trial here each of the following five elements of the offense and the Government must prove each of those elements beyond a reasonable doubt.
 
 
 324
 First, that the defendant whose conduct you're considering committed the offense charged in Count Four, in Count Three or the second racketeering act of Count One; that is, that the Government must prove beyond a reasonable doubt that the defendant committed the offense of distributing marijuana or conspiring to distribute marijuana or conspiring to distribute cocaine.
 
 
 325
 Second, that this offense was part of a series of three or more offenses committed by the defendant in violation of the drug laws which make it a crime to distribute marijuana and other controlled substances.
 
 
 326
 Third, that the defendant committed the offenses in these series of violations with five or more persons.
 
 
 327
 Fourth, that the defendant acted as an organizer, supervisor or manager of these five or more persons.
 
 
 328
 Finally, number five, that the defendant obtained substantial income or resources from the series of narcotics law violations.
 
 
 329
 Let's examine each of those elements, the first of which is the Government must prove beyond a reasonable doubt that the defendant whose conduct you're considering committed a violation of the federal narcotics laws. You must find the defendant guilty of one of the other charges in Count Three or Count Four or the second act of racketeering in Count One of this indictment. Unless you find the defendant guilty of one of those acts the requirements of which I have described to you, you cannot consider the defendant's guilt under the continuing criminal enterprise law charged in this count, Count Two.
 
 
 330
 Emphasis added.
 
 
 331
 Immediately following the challenged language, the court stated:
 
 
 332
 By a continuing series of violations is meant three or more violations of the federal narcotics laws committed over a definite period of time. Thus, if you find beyond a reasonable doubt that over a period of time the defendant, Kevin Granato and Mario Parlagreco, distributed marijuana or cocaine or conspired to distribute marijuana or cocaine or aided and abetted the distribution of marijuana or cocaine on at least three occasions then you can find that that element is satisfied. You must, however, unanimously agree on which three acts constitute the continuing series of violations.
 
 
 333
 Finally, after reviewing in detail the other three requirements for a section 848(a) violation, the district court concluded its instruction on count two by stating that "the Government must prove [the fifth] element and the other four, all five of these elements, beyond a reasonable doubt " (emphasis added).
 
 
 334
 M. Parlagreco directs our attention to United States v. Hayward, 420 F.2d 142 (D.C.Cir.1969), but we find that case clearly distinguishable. There the court charged the jury that "if ... you find that the Government has proved beyond a reasonable doubt that the Defendant was present at the time when and at the place where the offense charged was committed, then you must find the Defendant guilty." Id. at 143-44 (emphasis added). The trial court in Hayward explicitly directed a guilty verdict in the event that the jury rejected defendant's alibi defense, which was obviously improper. See United Bhd. of Carpenters v. United States, 330 U.S. 395, 408 & n. 21, 67 S.Ct. 775, 782 & n. 21, 91 L.Ed. 973 (1947); Hayward, 420 F.2d at 144.
 
 
 335
 No such direction occurred here. Reading the challenged instruction in context, as we must, see Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), we conclude that the district court clearly instructed the jury that it could convict on count two only if it found that each element of a section 848(a) violation was proven beyond a reasonable doubt as to the defendant in question. Accordingly, no error is presented by the jury charge on count two.
 
 
 336
 H. Psychiatric examination.
 
 
 337
 Just prior to sentencing, DeCarlo's attorney delivered a letter to the district court applying for a psychiatric evaluation for DeCarlo prior to sentencing pursuant to 18 U.S.C. Sec. 4244(a) (1988), which provides:
 
 
 338
 A defendant found guilty of an offense, or the attorney for the Government, may, within ten days after the defendant is found guilty, and prior to the time the defendant is sentenced, file a motion for a hearing on the present mental condition of the defendant if the motion is supported by substantial information indicating that the defendant may presently be suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility. The court shall grant the motion, or at any time prior to the sentencing of the defendant shall order such a hearing on its own motion, if it is of the opinion that there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility.
 
 
 339
 The letter was based upon information of which DeCarlo's counsel had just become aware as a result of reviewing DeCarlo's presentence report. The report revealed that DeCarlo had (1) only completed the eighth grade; (2) been "diagnosed as learning disabled" and "described as a non-reader at age 15;" (3) achieved "a Full Scale I.Q. of 90 which was comprised of a Verbal I.Q. of 99 and a Performance I.Q. of 82;" (4) required therapy as a result of his stepfather's death in 1977; (5) "taken an overdose of non-prescribed medication in a suicidal gesture" in January, 1979, resulting in inpatient psychiatric evaluation and treatment for thirty days; and (6) been diagnosed at that time as "Anti-Social Personality," and later in 1979 as "self destructive" and "suffer[ing] from a learning disability" with suggestions of "latent schizophrenia."
 
 
 340
 The district court rejected the application on the basis of the staleness of the proferred information, DeCarlo's failure to make any claim of mental incompetence in a number of intervening criminal adjudications, the court's review of "hours of recorded conversations" between DeCarlo and undercover detective Murano, which indicated to the court that DeCarlo was "very shrewd, very cunning, very alert," and the court's observations of DeCarlo in the course of a nine-week trial.
 
 
 341
 The decision whether to grant a section 1844 motion lies within the discretion of the district court. Cf. United States v. Vamos, 797 F.2d 1146, 1150-51 (2d Cir.1986) (competence to stand trial), cert. denied, 479 U.S. 1036, 107 S.Ct. 888, 93 L.Ed.2d 841 (1987). We perceive no abuse of that discretion here. See id.; Newfield v. United States, 565 F.2d 203, 206-07 (2d Cir.1977).
 
 Conclusion
 
 342
 The judgments of conviction are affirmed.
 
 
 
 [1]
 The indictment in this case was initially filed on November 24, 1987. Superseding indictments were filed on December 14, 1987 and January 27, 1988
 
 
 [2]
 Ralph Russo was named as a defendant in the earlier indictments, but pled guilty to two counts thereof prior to the filing of, and was therefore not named in, the superseding indictment filed January 27, 1988 (the "Indictment"). Letterio DeCarlo, a brother of Nunzio DeCarlo, was named as a defendant in the Indictment and convicted on a number of counts, but his appeal has been dismissed. Gregory Scarpa, Jr. ("Scarpa") was also named as a defendant, but, as hereinafter described, was tried (and appealed) separately. The description of the Indictment that follows immediately in the text summarizes the charges therein only as they relate to the appellants on this appeal
 
 
 [3]
 The Indictment initially alleged as an additional predicate act the murder of one Peter Crupi by DeCarlo, but this allegation was stricken from the Indictment on motion of the government
 
 
 [4]
 See supra note 3
 
 
 [5]
 Sal from Virginia had arranged to purchase cocaine from Leon for $5,000. The two met and drove to the purported location of the cocaine, where Leon got out of the car with the money. Two of Leon's friends posing as undercover police officers then pretended to arrest Leon. Sal from Virginia immediately drove away. Leon and his friends divided the $5,000 between them
 
 
 [6]
 See supra note 5
 
 
 [7]
 This contention should be distinguished from the challenge to the district court's RICO jury instruction which is considered hereinafter in section G1 of this Discussion. The jury instruction is assailed for its asserted noncompliance with the requirement, as restated in United States v. Indelicato, 865 F.2d 1370 (2d Cir.) (in banc), cert. denied, --- U.S. ----, 109 S.Ct. 3192, 105 L.Ed.2d 700 (1989), --- U.S. ----, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989), that relationship and continuity be shown between or among the predicate acts of racketeering alleged to establish a "pattern of racketeering activity" within the meaning of 18 U.S.C. Sec. 1962 (1982). Catanzano here contends, however, that there is an insufficient nexus between the third predicate act of racketeering and the charged criminal enterprise to satisfy the distinct requirement of section 1962(c) that the "affairs" of the criminal enterprise be "conduct[ed]" by means of the racketeering activity
 
 
 [8]
 Subsequent to the oral argument of this appeal, the Supreme Court ruled, in Grady v. Corbin, --- U.S. ----, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), that "the Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted." Id. 110 S.Ct. at 2093. In Grady, it was held that a defendant who had pled guilty to misdemeanor charges of driving while intoxicated and failing to keep right of the median could not thereafter be charged with reckless manslaughter, second-degree vehicular manslaughter, criminally negligent homicide, and third-degree reckless assault based upon the conduct that led to the misdemeanor convictions. See id. at 2088-89, 2094 & n. 15
 Grady twice cites Garrett v. United States with apparent approval. See id. 110 S.Ct. at 2090-91, 2094 n. 15. Accordingly, we do not regard Grady as precluding the proof of previously prosecuted conduct as predicate acts in a subsequent RICO prosecution, or as a constituent offense of a continuing criminal enterprise as defined in 21 U.S.C. Sec. 848(c) (1988), at least where, as here, the RICO (or CCE) offense continues beyond the prior prosecution. See United States v. Pungitore, 910 F.2d 1084, 1111 n. 29 (3d Cir.1990) ("We dismiss out of hand the possibility that Grady overruled Garrett. If the Supreme Court on such grossly dissimilar facts intended to abandon Garrett, we think it would have said so. Instead, both the majority and the dissent in Grady cited Garrett without ever hinting that Garrett no longer was good law. 110 S.Ct. at 2091, 2102."); United States v. Esposito, 912 F.2d 60, 65 (3d Cir.1990) (same); see also United States v. Quinones, 906 F.2d 924, 928 (2d Cir.1990) (declining to read Grady as overruling "sword exception" to double jeopardy rule sub silentio ).
 
 
 [9]
 In addition to other appellants, Scarpa was charged as a participant in three of these conspiracies, and Letterio DeCarlo as a participant in two. See supra note 2